Thank you, Your Honor. Sorry, Your Honors. Good morning, Your Honors. This appeal is about whether the government is required under 18 U.S.C. 3500 to make a good-faith effort to obtain statements of a witness that it calls at trial and that the government knows are in the witness's possession, that the government knows relate to the subject matter of the witness's testimony, whether the government is required to turn those materials over to the defense, or at least whether it's required to ask the government for those materials. In this case, my client was in a ---- Roberts. I don't disagree, though, that the government did not have possession of these materials. Bursch. I don't disagree. I mean, I agree it did not have possession. It technically and actually — it technically did not have possession. It did not have the absolute right under a contract to get those documents. It didn't have constructive possession. It didn't have constructive possession is the word. And, Paul, I mean, was the person who had them an arm of the government? No. The person was not an arm of the government. Then how can you say that this was Brady-type, you know, all the different things in that category of material? Well, because the government — because this was an interest — this was a — Does the government have a duty to go out and look for material which might help your client? No. No. But the government has a duty to ask a witness that it knows, that it prepares, that it knows created interview memoranda relating to the very offense conduct Does the government, when it has a witness before it, have a duty to ask that witness, by the way, is there anything favorable to the other side that you know? Not — no, not necessarily. But it does have the obligation to turn over the statements of that witness, which are the interview memoranda. If that witness — does it know what is in those statements? It knows that it has the — that he — You know, a witness has made statements. A witness may have things in its head, his head, her head. Does the government have to probe those to find out whether they might be favorable to you? I don't think so. I don't think so. What's the difference here? We know — the government knows if its statements were made, but it doesn't know if those statements are favorable to your client, material, gettable under attorney-client privilege, any number of things. Where do we get a duty on the government to go and look for things for you? Well, it's not a matter of a duty to look for things for me or for defense counsel. It's a matter to take — to act in good faith. And I think that the government in this particular case, this is a — this is a unique case. It has a unique set of facts. In most of the cases where the government did not — where there's a challenge to the government having to go out and get statements of witnesses that are not in its possession, the government — there's always — the Court always says — will generally deny it, saying it was not in the government's possession and the government wasn't aware of them. Here, the government was aware that this witness, who the government called, he was an attorney for the company. I'm sympathetic in a way. I think the U.S. attorneys work for the Department of Justice, not for the Department of Public Prosecutions. And that means — that's what Judge LaValle always says — and that that means that if they learn something or are in a position to learn something that suggests that somebody wasn't guilty, that should be one of the things they do. But to say that they should do that and take that into account is very different from our saying that if, in a particular case, they haven't done that, that amounts to a Brady violation. I — My, that goes so much further. I agree. I think that it goes further. It's not a Brady violation, because we don't know what was in the materials. But I do think it's a Jencks Act violation. And it's a potential Giglio violation, because I could tell — I could tell, Your Honors, that if I — I would have asked for that material, I would have demanded that material, because I could imagine that the — the internal investigation interviews memoranda of outside counsel, where — where they — where a unindicted co-conspirator was the company's CEO and the government and — and wasn't prosecuted and was actually promoted, I could say, I think I could have done some pretty good impeachment cross-examination of the outside counsel witness. Unfortunately — and I don't — I don't — unfortunately, defense counsel here didn't do that, but I think that the government has an obligation in these situations, just as a matter of good faith, to say, look, we know that you created these memoranda. We know these memoranda are your statements, and therefore, under Jencks, can you give it to us so we can turn it over to the defense? So for us to order relief, you would need to show prejudice. How would you propose to do that? I — well, I would show prejudice because right here we have — I mean, just — just one area of prejudice that we have is that the internal investigation was of the same conduct at issue in the prosecution. The — the person at — who at the time of the conduct was the general counsel of the company, Mr. Massad. Mr. Massad was — was not prosecuted by the government and was subsequently, by the time of the trial, promoted to its — to the company's CEO. In such a situation, it would have been — I think that there would have been, you know, material within the attorney's memoranda that would have led me — would have allowed me to cross-examine the witness as to why did you not interview Mr. Massad, which would have been telling in that case, or how did you interview Mr. Massad, because part of the cross-examination of my client was going to how they treated him during the interview, whether they gave him lunch, whether he — they sat him — whether he was sitting down for too long, whether they — Absolutely. And there could be much more. There also — the government — You don't know. You don't know what's in those documents. But that's the problem. But that is the problem. It might have hurt you. I — I — well, if it — it — I can't imagine it could have hurt me, but — It might. Yes. I mean — I don't know. It might. It might. But, you know, the government also said that Mr. Massad was a co-conspirator and introduced out-of-court statements of Mr. Massad emails that were very damaging to my client. If I was able to — if there was an interview memoranda of Mr. Massad, I could have used those statements under Rule 806 to undermine Mr. Massad's credibility. And so those — I mean, in this — this is a very unique case. I'm not asking the Court to go well beyond what's out there, but this is a unique case where the government knows about statements of a witness that it called and that I don't believe are protected by the attorney-client privilege. Thank you. We'll hear from the government. May it please the Court. My name is Juan Shin. I'm an assistant U.S. attorney for the Southern District of New York. Could you adjust the microphone up? You're taller than me. My apologies. Or being taller, yes. Yeah. There you go. Thank you. So my name is Juan Shin. I'm an assistant U.S. attorney in the Southern District of New York, and I represent the United States in this appeal, as I did in the district court. Now, it was interesting. It actually turns out Mr. Kreitzman and I agree on a lot about this case. We agree that the government never possessed the putative materials that are at issue, either actually or constructively. There is one thing I need to correct. There is no record in this case that those materials actually exist. He keeps saying the government knows that these things exist. It should have asked for them. There is no evidence in the record that UFP and its counsel interviewed Matt Massad as part of its internal investigation. We don't know one way or the other. So that is one disagreement, and that needs to be corrected in the record. So another point that Mr. Kreitzman and I agree on is that the government should act in good faith. However, the evidence here is replete with — it's full of the government's good faith. So the reason that the government did not ask UFP whether it had interviewed Matt Massad, and if so, to produce those materials, is that it was limited to those two interviews. Now, so again, the government did not ask for that waiver. UFP voluntarily offered to provide two memoranda of interviews of two individuals, Mr. Lees and the government's main cooperator, Mr. DiCello. UFP voluntarily produced those, and it explicitly stated that its waiver was limited to ask UFP for a broader waiver in keeping with Department of Justice policy in the Philip memo. The Philip memo, which, by the way, was passed in response to this Court's concerns about government interference with corporate right to counsel. And so the government was acting in good faith in that respect. Another way in which the government was acting in good faith is that the government informed Mr. Lees' trial counsel that — it informed Mr. Lees' trial counsel about UFP's position with respect to attorney-client privilege. It informed Mr. Lees' counsel that although UFP had produced a memoranda of two interviews, it was asserting its privilege with respect to the rest of its investigation. Mr. Lees' counsel could have at that point subpoenaed UFP and litigated the privilege issue before Judge Karas. However, defense counsel chose not to. Another way in which defense counsel could have obtained the material is by subpoenaing Mr. Massad himself. And in fact, defense counsel did subpoena Mr. Massad. Ultimately, however, defense counsel chose not to call Mr. Massad as a witness. There's nothing in the record that explains why that was. But this sequence shows, Your Honor, that the government was acting in good faith. And at bottom, what you have here is that they're about the unfairness at trial if the government suppresses or withholds information in its possession. They are not freestanding — they're not freestanding rights of defendants to demand that the government act in a particular way or conduct its investigation in a particular way or interact with private party witnesses in a particular way. There's nothing in Brady, Jiglio, or the Jenks Act that reaches such an expansive claim as the defense is asserting here. Beyond that, Your Honor, as Judge — as Your Honor, Judge Carney alluded to, there's nothing material about even the theoretical existence of whatever might have been in these memos if they existed. So the defense claim here is that the material might have helped him cross-examine UFP's outside counsel who testified at trial. It might have given him a more effective cross-examination of that witness. However, the defense at trial was able to make those points through his cross-examination of the outside counsel. He made points about whether the interview was unfair, whether Mr. Lee's was being treated unfairly at the interview. He made those arguments in his summation. And apart from that, Mr. DeWard was not the central witness at this trial. He was not the central evidence at this trial. Any potential Mossad interview would leave completely undisturbed the testimony of the government's main cooperator, Kevin DiCello. He's the one who said Mr. Lee's approved of the shady deal in this case. Any potential additional cross-examination of UFP's outside counsel would have had nothing to do with that. Also, there was substantial documentary evidence in this case. There were e-mails between Mr. Lee's, the defendant, and Mr. DiCello, as well as with other individuals, detailing Mr. Lee's' involvement in various parts of the scheme. Again, all of that would have been completely undisturbed by additional cross-examination of UFP's outside counsel. So with all of that, Your Honor, this argument suffers from, again, numerous defects. There's no evidence in the record that these documents exist. The government never possessed them, actually. The government never possessed them constructively. They would have gone to what is essentially an irrelevant or a cumulative issue in terms of the cross-examination of UFP's outside counsel, and they were not material in the case. There's no reasonable probability that the verdict would have been different here. Now, Your Honor, the defense also raised two other issues, the admissibility of certain e-mails under the co-conspirator exception, as well as certain challenges to the reasonableness of a sentence. We've addressed those issues at length in our briefs, and so unless the Court has any other questions, the government is happy to rest on those briefs. Thank you. We'll hear the rebuttal. Thank you, Your Honors. This is a brief rebuttal, but basically the issue is it's true that we don't know whether an interview memorandum of Mr. Massad exists, but we know that there were other interview memoranda conducted during this internal investigation. I believe that is on the record in Mr. DeWard's testimony. And whether Mr. DeWard interviewed Mr. Massad is very interesting. It would be very informative to the defense and material, because if the – as I've said before, if Mr. DeWard's – the entire purpose of his testimony was to discuss how my client was evasive and moved – and dishonest during the interview, and it would have been interesting to have seen whether the company either interviewed its general counsel, who the government labeled as a co-conspirator, and who basically was later promoted to CEO, which in that sense also, it's quite hard to understand how the government would not pursue statements or at least information relating to Mr. Massad, why was – from a public company, why was a general counsel of a public company who the government labeled as a co-conspirator, and in order to get in statements, in order to get into e-mails that were damaging to my client, ultimately never – were not – were so uninterested about whether the – whether Mr. DeWard had conducted an interview of Mr. Massad, whether they had any information about Mr. Massad. Secondly, well, I think that it's – you know, the government says that – Isn't in the end your whole problem and irritation with this case the fact that Mr. Massad was not charged and that the other two people received lower sentences than your guy? And, you know, that may be something that is troubling. On the other hand, it happens all the time. And you're saying, why did it happen? And so there must have been something behind it, except we see it happen all the time. And didn't Judge Karas, after all, in giving your client a sentence which was way below the guidelines, kind of probably took into account exactly the fact that some people weren't charged who were called conspirators and some people got lower sentences because they cooperated or they pled, but acted as a good district judge would in such a situation? I would agree with that, except for the point about the fact that the main – the leader and organizer of the scheme, the person who stood to benefit, a person who had a prior conviction, who pled basically on the eve of trial, did not cooperate with the government. But he pled. But, yes. But he – You know, I have long, long been troubled by the fact that people who plead get off more easily than people who don't. And it's something that is a troubling part of our criminal law system, but it is. It is. That – we do it all the time. I mean, you see that always that people who plead get lower sentences. And that's one of the reasons that the district courts have been given discretions, to take that into account. I understand that, Your Honor. But this appeal is really not about my irritation with that, although I will admit to being irritated by that. Thank you, Your Honors. Thank you. We'll preserve that.